AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Apple iPhone<br>Seizure No. 2025250100015201<br>("Target Device 3") | Case No. **25MJ00060-KSC** |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
   ☑ evidence of a crime;
   ☐ contraband, fruits of crime, or other items illegally possessed;
   ☐ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841 | Possession with Intent to Distribute |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

   ☑ Continued on the attached sheet.
   ☐ Delayed notice of ____ days *(give exact ending date if more than 30 days: ____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

John Pantoja, HSI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: January 7, 2025

*Judge's signature*

City and state: San Diego, California    Hon. Karen S. Crawford, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Task Force Officer John R. Pantoja, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> TCL Cellphone
>
> Seizure No. 2025250100014901
>
> ("**Target Device 1**")
>
> Samsung Cellphone
>
> Seizure No. 2025250100015001
>
> ("**Target Device 2**")
>
> Apple iPhone
>
> Seizure No. 2025250100015201
>
> ("**Target Device 3**")

(collectively, the "**Target Devices**") as further described in Attachments A-1, A-2, and A-3, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Section 841 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Steven Anthony BASH ("Defendant") for distributing fentanyl. The **Target Devices** are currently in the custody of Homeland Security Investigations and located at 2055 Sanyo Avenue, Suite 120, San Diego, California 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the

United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4. I have been employed by Immigration and Customs Enforcement (ICE) as a Deportation Officer for approximately six years. I am currently assigned as a Task Force Officer (TFO) to the Fentanyl Abatement and Suppression Team (FAST) of the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. FAST is an HSI-led multi-agency task force focused on stopping the spread of fentanyl in San Diego County and bringing down the overdose rates. FAST was designed to provide support to state and local agencies seeking to attack the problem of fentanyl distribution in the County, and to target fentanyl distributors causing overdoses and deaths. FAST investigates illegal drug trafficking organizations whose operations involve the distribution of wholesale and retail quantities of fentanyl, but due to the current drug landscape, FAST investigations have also uncovered organizations whose operations involve the distribution of wholesale and retail quantities of oxycodone, hydrocodone, alprazolam, anabolic steroids, other controlled pharmaceutical drugs, cocaine, methamphetamine, marijuana, and heroin in and around the San Diego, California area. I generally investigate violations of United States Code with an international nexus, including drug importation and trafficking. My main duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances and the importation and distribution of illegal substances, in violation of Title 21 of the United States Code.

5. As a federal law enforcement officer, I have received formal training and extensive on-the-job training experience pertaining to the investigation of drug trafficking, and other techniques used for contraband smuggling. I have investigated trafficking of illicit controlled substances and other crimes that have resulted in arrests, indictments, and convictions.

6. While participating in these and other criminal investigations, I have executed search warrants on buildings, residences, and vehicles. As a result of these investigations, I have become familiar with methods and techniques used by drug traffickers to import

drugs into the United States and distribute those substances within the United States and the methods and techniques to promote and facilitate unlawful activity.

7. During my employment as a TFO, I've conducted criminal investigations for multiple violations of federal and state laws including, but not limited to narcotics smuggling and organized criminal activity. I have conducted and/or assisted in investigations involving controlled substances. I have authored and/or participated in the execution of narcotic-related arrests and search warrants for violations involving controlled substances, including fentanyl and methamphetamine. Through these investigations, I have gained extensive knowledge from users of narcotics, sellers of narcotics, confidential informants, veteran narcotics detectives and other law enforcement officers regarding the manner in which narcotics are sold, distributed, transported, stored, concealed and ingested. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug distributors will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages; tending to indicate efforts to distribute controlled substances within the United States and between the United States and Mexico;

   b. Drug distributors will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

   c. Drug distributors and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

   d. Drug distributors will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

   e. Drug distributors will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f.  Drug distributors and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds;

g.  Drug distributors and their co-conspirators often use portable Wi-Fi/hotspot devices. Wi-Fi hotspots are internet access points that allow the Drug distributors to connect to a Wi-Fi network, which are "pocket-sized" mobile routers that allow the connection to the internet, via Wi-Fi. This allows the distributors to make phone calls, via Wi-Fi from anywhere, and limit their personal/identifying data to be detected; and

h.  The use of cellular telephones by conspirators or drug distributors tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

8. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

a.  tending to indicate efforts to possess and/or transport with the intent to distribute federally controlled substances within the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d.     tending to identify travel to or presence at locations involved in the possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

e.     tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

**A. Background**

9. Since October 11, 2024, Homeland Security Investigations (HSI) San Diego has been leading an investigation into an individual who has been distributing illegal substances within the United States. The investigation originated from a proffer session and subsequent cell phone analysis of an individual who was arrested in March 2024, for smuggling fentanyl into the United States. The individual consented to a search of their cell phone, which contained Defendant's cell phone number. In turn, that individual confirmed they would deliver fentanyl to Defendant in multiple ounce quantities.[1]

**B. December 10, 2024**

10. On December 10, 2024, investigators conducted surveillance at Hotel Palmeras, located at 230 Broadway, in Chula Vista, California 91910. At approximately 1:06 PM, investigators observed Defendant, who they recognized based upon his Facebook

---

[1] The individual has been cooperating with investigators since October, 2024. The individual has pled guilty and provided information before he/she was sentenced; the individual's conviction for distribution is their only criminal conviction. Investigators are not aware of any time during his/her cooperation with law enforcement when he/she has knowingly given false information. Further, much of the information provided by him/her has been corroborated by further investigation. Investigators believe that the information provided by the individual is credible and reliable.

profile picture[2], walk into the parking lot from the main road. It was unknown which room he subsequently went into.

11. At approximately 2:45 PM, investigators observed Defendant leave Hotel Palmeras on an electric scooter. Defendant continued westbound on E Street and met with a female in the parking lot adjacent to 646 E Street. The female was driving a silver Kia Soul, bearing California license plates. Defendant entered the front passenger seat of the Kia and remained inside for approximately five minutes. Based on training and experience, investigators suspected they had observed a hand-to-hand drug transaction between Defendant and the female who drove the Kia. Defendant then returned to Hotel Palmeras and entered room #121. According to hotel management, the room was rented to "Laura Copeland."

12. At approximately 3:00 PM, investigators observed Defendant open the trunk of a white BMW, which was parked in the hotel parking lot. Investigators were unable to determine whether he placed or removed anything from the vehicle. At approximately 3:04 PM, a silver Acura bearing California license plates parked in the lot of Hotel Palmeras. Investigators observed Defendant interact with the driver before the Acura departed approximately seven minutes later. Due to another parked vehicle obstructing the view, investigators were unable to determine what had occurred. However, based on training and experience, investigators believed that they observed another hand-to-hand drug transaction.

**C. December 17, 2024**

13. On December 17, 2024, investigators conducted surveillance in the area of the Sure Stay Best Western, located at 699 E Street, Chula Vista, California 91910. At approximately 9:33 AM, investigators observed Defendant and two males walk into the east parking lot of the Sure Stay Best Western. One male left the area, while the second

---

[2] Also included on Defendant's Facebook profile is a photograph of his California identification card, with the picture obscured. Visible, however, is the identification card number. Agents conducted a records check of this identification number, which came back to Defendant.

remained behind in the parking lot. Defendant was then observed going into room #236 for a few minutes, before returning to meetup with the male who had remained in the parking lot. Defendant and the male, later identified as Royce Edgcomb (Edgcomb), were approximately 15 feet from an investigator, when the investigator observed Defendant turn his back and show Edgcomb something in his hands. Edgcomb appeared to take possession of the item and then immediately left the area. Based on training and experience, investigators believed they had observed a hand-to-hand drug interaction.

14. Investigators continued to monitor Edgcomb as he walked to the E Street Trolley Station. During surveillance, investigators did not see him interact with anyone else. Investigators then contacted Edgcomb a few minutes later, after observing him smoking suspected narcotics, which he smoked via a tooter and spoon. A subsequent search of Edgcomb revealed he was in possession of **Target Device 1** and approximately two grams of a powdery, white substance, which field tested presumptive positive for fentanyl. **Target Device 1** and the fentanyl were seized and Edgcomb was released.

15. At approximately 11:30 AM, investigators observed Defendant exit room #236 at the Sure Stay Best Western and walk to the Denny's Restaurant, located at 692 Chula Vista Street, Chula Vista, California 91910. Investigators then placed Defendant under arrest.

16. During a search incident to arrest, investigators located **Target Device 2**, which was held by Defendant. Inside a small black and white backpack carried by Defendant, over his shoulder, investigators found two plastic bags, which both contained a white, powdery substance. Investigators observed the substance and packaging appeared similar to the substance and packaging seized from Edgcomb. A field test of a sample of the substance tested presumptively positive for fentanyl. The combined weight of fentanyl in two plastic bags was approximately 40.8 grams. Additionally, during the search incident to arrest, investigators found two rocks, which later tested presumptive positive for fentanyl and weighed approximately 2.9 grams, inside an orange cylinder in Defendant's jacket pocket. An additional single rock was also found loose in his clothing, which also tested

presumptive positive for fentanyl, weighing approximately 1.9 grams. In total, the weight of fentanyl recovered from Defendant during the search incident to arrest was approximately 45.6 grams.

17. As Defendant was being arrested, investigators observed a female attempt to enter room #236. Investigators detained her and then asked a second female who was already inside room #236, later identified as Laura Copeland (Copeland), to exit. Copeland complied. According to the hotel manager, Copeland was the sole individual registered as a guest for room #236. Copeland gave consent for investigators to enter room #236 to retrieve a pair of her shoes. While retrieving her shoes, investigators observed a plastic bag, which contained an unknown amount of a powdery, white substance, suspected of being fentanyl, on a desk.

18. At approximately 3:29 PM, during a video-recorded interview, Defendant was advised of his Miranda rights and elected to make a statement. Defendant stated he would go to Mexico three to four times a week, to obtain a single use amount of fentanyl. After using, he would cross back into the United States and meet a "runner," who would deliver him up to four ounces of fentanyl. This would occur each time he crossed back into the United States. Defendant further stated he would pay up to $1,500.00 each time for the fentanyl.

19. At approximately 6:45 PM, investigators served a federal search warrant, signed by the Honorable United States Magistrate Judge Steve B. Chu on room #236. During the search, **Target Device 3** and approximately 6.1 grams of a white, powdery substance (including the plastic bag previously observed in plain view), which later field tested presumptive positive for fentanyl, were seized. Both **Target Device 3** and the fentanyl were located next to each other, on the same desk. Also found and seized during the search were approximately two grams of a white, crystalline substance which field tested presumptive positive for methamphetamine, located in a folded dollar bill on a bed; approximately eight grams of a white, powdery substance, which later field tested presumptive positive for cocaine, located in a white, Nike handbag; and other contraband

associated with narcotics sales, to include a digital scale, a funnel laced with fentanyl residue, and additional plastic baggies consistent in appearance with those found containing fentanyl on Edgcomb and Defendant.

20. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that Edgcomb was using **Target Device 1** to communicate with Defendant, and Defendant was using **Target Devices 2 and 3** to communicate with Edgcomb and others to further the distribution of illicit narcotics within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics.

21. Based upon my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on November 17, 2024, up to and including December 17, 2024, the date of Defendant's arrest.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and

can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

25. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

26. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of Defendant's violations of Title 21, United States Code, Section 841. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1, A-2, and A-3, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Task Force Officer John R. Pantoja
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 7th day of January, 2025.

_____
Honorable Karen S. Crawford
United States Magistrate Judge

# ATTACHMENT A-3

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Apple iPhone
>Seizure No. 2025250100015201
>(**"Target Device 3"**)

**Target Device 3** is currently in the possession of Homeland Security Investigations, located at 2055 Sanyo Avenue, Suite 120, San Diego, California 92154.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of November 17, 2024, up to and including December 17, 2024:

a. tending to indicate efforts to distribute controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in distribution of controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Section 841.